# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### ROCK ISLAND DIVISION

DAVID L. SCOTT,           )
    Plaintiff,        )
                            )
         v.        )
                            )   Case No. 4:09-cv-4040
MICHAEL J. ASTRUE,        )
Commissioner of Social Security,  )
    Defendant.        )
                            )
                            )

## O R D E R  &  O P I N I O N

Pursuant to 42 U.S.C. § 405(g), Plaintiff appeals the decision of the Social Security Administration denying his claim for disability benefits.  This matter is before the Court on Plaintiff's Motion for Summary Judgment (Doc. 10) and Defendant's Motion for Summary Affirmance (Doc. 12). Each party has responded in opposition to the other's Motion, and they are now fully briefed and ready for disposition.  For the reasons stated below, Plaintiff's Motion for Summary Judgment is denied, and Defendant's Motion for Summary Affirmance is granted.

### LEGAL STANDARD

To be entitled to disability benefits under the Social Security Act, a claimant must prove that he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  To determine if the claimant is unable to engage in any substantial gainful activity, the Commissioner of Social Security engages in a factual determination. *See McNeil v. Califano*, 614 F.2d 142, 145 (7th Cir. 1980).  The

factual determination is made by using a five-step sequential analysis. 20 C.F.R. §
404.1520; *see also Maggard v. Apfel*, 167 F.3d 376, 378 (7th Cir. 1999).

In the first step, a threshold determination is made to determine whether the
claimant is presently involved in a substantially gainful activity. 20 C.F.R. §
404.1520(b). If the claimant is not under such employment, the Commissioner of
Social Security proceeds to the next step. At the second step, the Commissioner
evaluates the severity and duration of the impairment. 20 C.F.R. § 404.1520(c). If
the claimant has an impairment that significantly limits his physical or mental
ability to do basic work activities, the Commissioner will proceed to the next step.
At the third step, the Commissioner compares the claimant's impairments to a list
of impairments considered severe enough to preclude any gainful work; and, if the
elements on the list are met or equaled, he declares the claimant eligible for
benefits. 20 C.F.R. § 404.1520(d).

If the claimant does not qualify under one of the listed impairments at Step
Three, the Commissioner proceeds to the fourth and fifth steps. At the fourth step,
the claimant's Residual Functional Capacity ("RFC") is evaluated to determine
whether the claimant can pursue her past work. 20 C.F.R. § 404.1520(e)-(f). If she
cannot, then, at Step Five, the Commissioner evaluates the claimant's ability to
perform other work available in the economy. 20 C.F.R. § 404.1520(g). The
claimant has the burden to prove disability through Step Four of the analysis, *i.e.*,
he must demonstrate an impairment that is of sufficient severity to preclude him
from pursuing his past work. *McNeil*, 614 F.2d at 145. However, once the claimant

shows an inability to perform his past work, the burden shifts to the Commissioner, at Step Five, to show the claimant is able to engage in some other type of substantial gainful employment. *Id*.

Once a case reaches a federal district court, the court's review is governed by 42 U.S.C. 405(g), which provides, in relevant part, "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Maggard*, 167 F.3d at 379 (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

A court's function on review is not to try the case de novo or to supplant the decision of the Administrative Law Judge ("ALJ") with the Court's own assessment of the evidence. *See Pugh v. Bowen*, 870 F.2d 1271, 1274 (7th Cir. 1989). A court must only determine whether the ALJ's findings were supported by substantial evidence and "may not decide the facts anew, reweigh the evidence, or substitute [its] own judgment" for that of the ALJ. *See Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Furthermore, in determining whether the ALJ's findings are supported by substantial evidence, credibility determinations made by the ALJ will not be disturbed "so long as they find some support in the record and are not patently wrong." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).

However, the ALJ must articulate reasons for rejecting or accepting entire lines of evidence. *Godbey v. Apfel*, 238 F.3d 803, 807-08 (7th Cir. 2000). The ALJ is required to "sufficiently articulate [her] assessment of the evidence to 'assure us

that [she] considered the important evidence . . . and to enable us to trace the path of [her] reasoning.'" *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

## BACKGROUND

### I.      Procedural History

Plaintiff, David L. Scott, was born December 21, 1979. (Tr. 337). Plaintiff worked for Modern Machine and Manufacturing from 2001 to 2003, primarily working on a machine that cuts tractor parts. (Tr. 391). As a machine operator, he was required to walk, stand, stoop, and handle or grab objects frequently and to sit and climb occasionally. (Tr. 94). Most of the time, his job duties required him to lift 10 lbs, but sometimes he lifted up to 50 lbs. (Tr. 94). Before this employment, he worked as a kiln placer, stocker, janitor, and washer from 1995 to 2000. (Tr. 94, 392, 1135). His job duties for these previous positions included pushing cards into a kiln and stocking items in shelves. (Tr. 392). Plaintiff last worked at Modern Machine and Manufacturing on June 30, 2003 (Tr. 94, 1117), which he initially reported as his disability onset date (Tr. 93).

Plaintiff filed an application for supplemental security income benefits on August 18, 2003 and an application for disability insurance benefits on September 10, 2003, based upon his alleged disabling conditions of costochondritis and a social anxiety disorder, alleging a disability onset date of June 30, 2003 (Tr. 92-102, 81-83). At that time, he had been living with his girlfriend and her daughter for more than eight years. (Tr. 389, 412). Plaintiff alleged in his initial Disability Report that

he quit working at Modern Machine and Manufacturing because he could not "handle the pain" resulting from his costochrondritis condition which was exacerbated by the physical demands of his job. (Tr. 93). He also indicated he had been diagnosed as suffering from a social anxiety disorder. (Tr. 93).

The applications were denied initially and upon reconsideration, and proceeded to a hearing before Administrative Law Judge ("ALJ") Barbara Welsch that resulted in a denial decision by the ALJ on November 22, 2006. (Tr. 307-313). Plaintiff filed a request for review with the Appeals Council on January 3, 2007. (Tr. 23). The Appeals Council denied the request for review on February 16, 2007, making the decision of the ALJ the final decision of the Commissioner. (Tr. 23).

Having exhausted all administrative remedies, Plaintiff sought judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). On September 28, 2007, the parties stipulated to a voluntary remand for consideration of evidence that Plaintiff had submitted to the Appeals Council that was not included in the record until after the ALJ issued her denial decision. (Tr. 23, 351-55). The ALJ convened another hearing on July 22, 2008, to consider the expanded record. (Tr. 1114-40). At the hearing, at which Plaintiff was represented by counsel, Plaintiff testified and amended his disability onset date to June 1, 2006. (Tr. 1139). A vocational expert, Dr. James Lanaier, also testified at the hearing. (Tr. 1134-39). On September 10, 2008, the ALJ issued a decision that Plaintiff was not disabled (Tr. 23-33), and the Appeals Council subsequently declined his request for review (Tr. 8-10), making the

decision of the ALJ the final decision of the Commissioner. Plaintiff filed the instant appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) on December 2, 2009.

## II.   Relevant Medical History

On July 23, 2003, Plaintiff voluntarily went to Bridgeway Mental Health for a Comprehensive Mental Health Assessment. (Tr. 179-185). The primary diagnostic impairment was generalized anxiety and it was noted that he had been using marijuana every day for eight years as a way of coping. (Tr. 181). Plaintiff was also seen by Dr. Sudesh Sachdeva for a psychiatric assessment on August 4, 2003 at Bridgeway. (Tr. 175-177). The doctor noted Plaintiff's anxious mood and diagnosed him with generalized anxiety disorder with depressive symptoms, possible substance abuse, and obsessive compulsive personality traits. (Tr. 176). Plaintiff was prescribed Prozac and scheduled for further therapy sessions. (Tr. 177). He was subsequently seen on August 11, 2003 (Tr. 174), August 26, 2003 (Tr. 173), and September 16, 2003 (Tr. 172), at which time Plaintiff reported that he was dealing with the various stresses in his life with the help of his medication and positive thinking.

On November 6, 2003, Patricia A Beers, Ph.D., a state agency physician prepared a mental RFC assessment of Plaintiff (Tr. 186-189). The result of this assessment showed that Plaintiff's mental impairments were in the range of "not significantly limited" to "moderately limited." (Tr. 186-187).[1]  In connection with his

---

[1]   The assessment showed that Plaintiff had "not significantly limited" abilities to understand and remember detailed instructions and to carry out detailed instructions. With regard to Plaintiff's social interaction, it showed that Plaintiff had "moderately limited" abilities to interact appropriately with the general public

diagnosis of "generalized anxiety," Dr. Beers found that Plaintiff experienced social anxiety and avoidance but was still able to understand, recall, and execute most instructions although he would be more successful in a socially restricted setting. (Tr. 188).

On September 29, 2005, Plaintiff was admitted to Great River Medical Center with suicidal ideations. (Tr. 577-578). During his hospitalization, Plaintiff complained to his treating physician, Dr. Frank Jones, M.D., that the medical staff tends to make him mad and expressed his desire to stab people with a screwdriver when they treat him that way. (Tr. 581-583). Plaintiff was diagnosed with depressive and anxiety disorder. (Tr. 583). When Plaintiff was hospitalized again at Great River Medical Center with nausea and vomiting from October 6, 2005 to October 11, 2005, his treating gastroenterologist, Michael J. Niehaus, M.D., suspected that Plaintiff might have a psychosomatic component to his impairment. (Tr. 479-480).

On March 9, 2006, Plaintiff was seen by Dr. Martin Ruzek at Community Health Centers of Southeastern Iowa, who diagnosed Plaintiff's symptom as "[i]ntractable chest pain" with psychosomatic disorder. (Tr. 215). Dr. Ruzek referred Plaintiff to a psychiatrist for a second opinion and prescribed Lexapro; however, Plaintiff refused to take any antidepressants. (Tr. 215). On April 10, 2006 and May 8, 2006, Plaintiff was seen by Dr. Jonathan C. Lindo at The Lindo Clinic. Dr. Lindo

---

and to get along with co-workers and peers without distracting them or exhibiting behavioral extremes. (Tr. 186-187).

diagnosed Plaintiff with depression and irritable bowel syndrome (or chronic abdominal pain). (Tr. 290, 293).

On June 16, 2006, Plaintiff saw Dr. Scott Wright at Bridgeway. (Tr. 271-73). Plaintiff complained of anxious and irritable moods as well as social phobia. (Tr. 271). He also stated that he obsesses over washing his hands. (Tr. 271). Dr. Wright noting that Plaintiff's speech was somewhat rambling and nervous but not pressured, made an Axis I diagnosis of Obsessive-Compulsive Disorder with social phobic and paranoid features; Schizoaffective Disorder with anxious features and Bipolar type 2 were ruled out (Tr. 273). Dr. Wright assigned Plaintiff a Global Assessment of Functioning ("GAF") score "greater than 50" and prescribed medication. (Tr. 273, 1094).

On July 17, 2006, Plaintiff sought medical treatment for his left hand after he punched a wall. (Tr. 275-277). A few days later, Plaintiff told Dr. Wright that he had become more irritable since his previous visit and prone to angry outbursts, and that he once punched a wall when he became angry upon hearing off-color remarks made by his girlfriend's relatives. (Tr. 301). Dr. Wright found Plaintiff's thought processes to be intact and that he had an euthymic affect.[2] (Tr. 301). Dr. Wright reaffirmed his diagnosis of obsessive compulsive disorder with social phobic and paranoid features and added bipolar affective disorder. (Tr. 301). Although Plaintiff attributed his change to his medications, it was noted that Plaintiff had these types of symptoms long before he was on medication. (Tr. 301).

---

[2]      Euthymia means "joyfulness; mental peace and tranquility" or "moderation of mood, not manic or depressed." *Stedman's Medical Dictionary* (27th ed. 2000), STEDMAN 141440 (Westlaw).

In August 2006, Plaintiff stated that he was doing better and was less angry during a return appointment with Dr. Wright. (Tr. 1076). Dr. Wright noted that there were no side effects from the medication, and that Plaintiff had non-pressured speech, a better mood, an euthymic affect, normal thought processes, and no suicidal or homicidal thoughts. (Tr. 1076). Dr. Wright also noted, on October 13, 2006, that Plaintiff's obsessive-compulsive symptoms were "about 30 percent better." (Tr. 1075). Dr. Wright noted in December 2006 that Plaintiff continued to have episodic spells of stress and feeling of hatefulness toward others. (Tr. 1074). Plaintiff had rambling speech and irritable mood, but had an euthymic affect with no side effects from the medication. (Tr. 1074).

On January 12, 2007, Dr. Wright prepared a Medical Source Statement regarding the nature and severity of Plaintiff's mental impairment, which indicated his opinion that Plaintiff had moderate to marked impairments in the areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (Tr. 1038-1040). Dr. Wright assessed Plaintiff's functioning as "moderately" or "markedly" limited in almost every functional area for the past twelve months. (Tr. 1039-40). Based on his assessment, Plaintiff had "moderately" limited abilities to understand, remember, and carry out simple and detailed instructions (Tr. 1039), and had a "markedly limited" ability to travel in unfamiliar places. (Tr. 1040). Contradictory assessments were made of Plaintiff's social skills: Plaintiff had a "markedly limited" ability to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, which

9

was inconsistent with the finding that he was "not significantly limited" in his ability to maintain socially appropriate behavior and only "moderately limited" in his ability to interact appropriately with the general public. (Tr. 1039-40). Dr. Wright suspected that the limitations found were present for at least a year before he first examined Plaintiff in June 2006. (Tr. 1040).

In March 2007, Dr. Wright noted that Plaintiff was "not being physically aggressive to anyone or breaking things" and that he had an euthymic affect (Tr. 1072). Although Plaintiff had racing thoughts, his temper appeared to be improved with more control. (Tr. 1072). But in April, Plaintiff was again depressed and anxious because his girlfriend's brain image showed a spot in her brain. (Tr. 1070). Plaintiff had a logical thought process and an euthymic affect with no side effects from his medication. (Tr. 1070). In June 2007, Dr. Wright noted that Plaintiff was still irritable about nearly everything on a daily basis. (Tr. 1068). Plaintiff was restless and slept poorly, but again had a logical thought process and an euthymic affect with no side effects from his medication. (Tr. 1068).  In September 2007, Plaintiff still had no side effects from his medication and an exam revealed that Plaintiff had some paranoia, rambling speech, irritable mood, full affect, intact thought processes, and psychomotor restlessness. (Tr. 1065).

On November 16, 2007, Plaintiff had a visit with Dr. Wright at which he reported that he threw a plastic table and it bounced off of his girlfriend. (Tr. 1086). It was noted that Plaintiff had an explosive temper even though he worked hard to control his temper. (Tr. 1086). Plaintiff's thought processes and thought content

were intact and his concentration was fine. (Tr. 1086). He had an euthymic affect with no side effects from the medication other than some sedation. (Tr. 1086). On that same day, Dr. Wright filled out a Mental Impairment Questionnaire, on which he opined, again in seeming contradiction to his treatment notes, that Plaintiff had "no useful ability to" understand and remember detailed instructions, but had a "limited but satisfactory" ability to carry out detailed instructions. (Tr. 1045). He added that Plaintiff had "none or mild" restrictions of daily activities, "extreme" difficulties of social functioning, and "four or more" episodes of decompensation[3] with extended duration. (Tr. 1046). Plaintiff had a "limited but satisfactory" ability to travel in unfamiliar place. (Tr. 1046). He opined that Plaintiff had "no useful" abilities to get along with co-workers or peers, to interact appropriately with the general public, or to maintain socially appropriate behavior. (Tr. 1046). Based on his assessment, Plaintiff would miss more than four days of work each month due to his impairments. (Tr. 1047). Dr. Wright also stated that Plaintiff's concentration was limited by his racing thoughts and distractibility and that his affect was unstable. (Tr. 1042). Lastly, Dr. Wright mentioned that drowsiness, fatigue,

---

[3]     "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode." 20 C.F.R Part 404, Subpart P, Appendix 1, 12.00(C)(4).

dizziness, decreased stamina, and slowed cognition were side effects from Plaintiff's medication. (Tr. 1042).

In February 2008, Dr. Wright stated that Plaintiff still had an explosive temper and irritability. He also noted that Plaintiff had an euthymic affect with no side effects from his medication. (Tr. 1081). In May 2008, Plaintiff showed great depression due to the death of his dog and a threat from his girlfriend that she intended to break up with him. (Tr. 1078). Plaintiff continued to complain about the denial of SSI and people being rude to him, but he denied planning to hurt anyone. (Tr. 1078). Dr. Wright noted that Plaintiff had increased anxiety but no side effects from his medication. (Tr. 1078).

In June 2008, Dr. Wright wrote a letter for Plaintiff stating that Plaintiff is not capable of pursuing full-time employment, followed by an explanation that Plaintiff's mental impairments are too severe for him to work full-time. (Tr. 1096). Dr. Wright further stated that he "whole-heartedly" supported Plaintiff in obtaining a medical card and disability benefits because Plaintiff needs financial support in order to afford the medications that decrease his psychiatric symptoms. (Tr. 1096).

On August 8, 2008, Plaintiff was convicted of battery for striking a person in the head with his fist. (Tr. 14-16).

## III.   Hearing Testimony

The ALJ held a hearing on July 22, 2008. (Tr. 1116). Plaintiff testified at the hearing with respect to his impairments. (Tr. 1117). He stated that his last job, at Modern Machine and Manufacturing, was terminated because of his stress and

missing work. (Tr. 1117). He testified that he could not sleep or think well. He stated that he was enraged on the job on many occasions due to stress and this had caused him to want to harm his supervisor physically. (Tr. 1118).

Plaintiff further testified about his social withdrawal problem. (Tr. 1119). He testified that he tried to avoid groups of people and that he took things the wrong way when people were just joking with him. (Tr. 1119). He rarely goes outside except for medical appointments. (Tr. 1119). He had some violent thoughts, punched a wall, kicked things, and threw a table. (Tr. 1122-23). He stated that he tried to avoid being out in public because he does not want to hurt people when he loses control over his temper. (Tr. 1122). He seldom goes outside because he does not want to converse with people. (Tr. 1130).

Plaintiff also stated that he had trouble concentrating and remembering things. (Tr. 1125). He could not watch a movie or television for more than fifteen minutes. (Tr. 1125). He testified that his financial difficulty and stomach pain cause him anxiety. (Tr. 1126). In addition, he also testified as to his obsession with cleanliness. (Tr. 1127).

With regard to his daily activities, Plaintiff testified that he sleeps much of the day, between 10 to 15 hours, because of his medicine. (Tr. 1130). He stated that he gets tired frequently and feels like he needs to take a nap. (Tr. 1131). He also testified about the side effects of the medication that he experiences, such as drowsiness, fatigue, and dizziness. (Tr. 1131).

After hearing Plaintiff's testimony, the ALJ heard the testimony of Dr. James Lanaier, the vocational expert. (Tr. 1134). In response to questioning by the ALJ, Dr. Lanaier testified that a hypothetical individual between age 23 and 28 and who was limited to medium work that is routine and repetitive in nature, with no more than occasional interaction with co-workers and supervisors could perform Plaintiff's past relevant work as a washer and kiln placer. (Tr. 1134-38). Finally, Dr. Lanaier testified that there are 44,500 jobs in the State of Illinois including hand packager, laundry worker, hand presser, and light housekeeper that also suited this hypothetical person. (Tr. 1138).

## IV. ALJ's Decision

The ALJ issued her decision on September 10, 2008. (Tr. 20-32). After reviewing the applicable legal standard for her decision, the ALJ found at Step One that Plaintiff had not engaged in substantial gainful activity since June 1, 2006, the alleged onset date for his disability.

At Step Two, the ALJ found that Plaintiff had impairments that impose work-related limitations and had severe impairments, noting that he had a gastrointestinal problem, and had been treated for obsessive-compulsive disorder with social phobia and paranoid features with an affective disorder in July 2006. However, the ALJ discredited Plaintiff's testimony that he cannot get along with other people. First, the ALJ indicated that Plaintiff failed to show that he has engaged in any persistent socially disruptive behavior or violent attacks. Second, the physicians who treated Plaintiff for his physical conditions have not noted his

uncontrollable anger. Third, Plaintiff did not act in a socially disruptive manner toward the medical staff when he was hospitalized in 2005 and 2006 for gastrointestinal problems. Finally, the ALJ relied on the fact that Plaintiff has maintained good relationships with his girlfriend and his brother.

The ALJ also discredited Dr. Wright's opinion that Plaintiff is unable to work, is moderately to markedly limited in his ability to perform basic work activities, has had four or more episodes of decompensation of an extended duration, is extremely limited in the area of social functioning, and has side effects from his medication. First, contrary to Dr. Wright's statement that Plaintiff had episodes of decompensation, there was no supporting medical evidence showing that Plaintiff actually had any decompensation of an extended duration. Second, Dr. Wright failed to actually state any side effects from medication that Plaintiff has experienced. Third, in contrast to Dr. Wright's opinion that Plaintiff has an extreme social difficulty, Plaintiff is able to maintain relationships with his girlfriend, his brother, and medical staff; also, Dr. Wright had not provided any clinical or medical findings to support his opinion on this matter. Fourth, Dr. Wright's opinion was only based on the subjective self-serving statements made by Plaintiff without any clinical or medical corroboration. Fifth, Dr. Wright's opinion was inconsistent with other physicians who had been treating Plaintiff for his physical ailments, as these doctors did not mention any clinical or medical symptoms that would support Dr. Wright's findings. For these reasons, the ALJ decided not to give controlling weight

to Dr. Wright's opinions pursuant to the principles set forth in 20 C.F.R § 404.1527 and § 416.927 and SSR 96-5/7p.

At Step Three, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R Part 404, Subpart P, Appendix 1. With respect to the physical impairments, Plaintiff did not have any symptoms set forth in Listings 5.02 to 5.09. Plaintiff's mental impairments do not meet the criteria of Listings 12.04, 12.06, or 12.08.

The ALJ considered whether the "paragraph B" criteria in Listing 12.06 are satisfied.[4] The ALJ found that Plaintiff had "no more than mild restriction" in activities of daily living because he is able to drive a car, prepare meals for himself, and attend to his own personal needs. She found that Plaintiff had "no more than moderate difficulties" in social functioning because Plaintiff's treating physicians have not noted extreme rage or aggressive behavior and Plaintiff has generally been able to control his temper, maintaining a good relationship with his girlfriend. The ALJ found that Plaintiff had "at most moderate difficulty" in concentration, persistence, or pace because Plaintiff is able to maintain concentration and persistence effectively when he is not experiencing anxiety or anger. She also found that there is no evidence of any episodes of decompensation. Thus, Plaintiff failed to meet the "paragraph B" criteria.

---

[4]      To satisfy the "paragraph B" criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. 20 C.F.R Part 404, Subpart P, Appendix 1.

Before going to Step Four, the ALJ made an assessment of Plaintiff's RFC. She found that Plaintiff had the RFC to perform medium, light, and sedentary work that is routine and repetitive in nature with the additional limitation of no more than occasional interaction with co-workers and supervisors. In making this finding, the ALJ noted that she considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence pursuant to the requirements set forth in 20 C.F.R § 404.1529, § 416.929, and SSR 96-4/7p.

The ALJ discredited Dr. Wright's opinion that Plaintiff is unable to work based on the fact that Plaintiff is able to attend appointments with other physicians, and that these physicians have not noted any uncontrollable rage or anger on the part of Plaintiff as reported by Dr. Wright. The ALJ found that Dr. Wright's opinion appears to have accepted Plaintiff's subjective statements without any medical evidence or other corroboration. Moreover, the ALJ found that Dr. Wright appears to be sympathetic to Plaintiff obtaining medical benefits and failed to mention Plaintiff's substance abuse history. Thus, the ALJ gave more weight to Plaintiff's actual daily activities and his ability to work in the past despite his mental impairments. The ALJ also considered Plaintiff's ability to follow the prescribed treatment and to abstain from alcohol and drug abuse.

The ALJ found that Plaintiff's most recent past work activities demonstrate that he is able to sit, stand, walk, lift, concentrate to complete tasks, and get along with co-workers and supervisors. Plaintiff also failed to demonstrate that he has

disabling side effects from his medication. The ALJ reasoned that since Plaintiff's own claim that he is unable to work is not supported by objective medical evidence, Dr. Wright's opinion based only on that subjective statement cannot be given controlling weight. Thus, Plaintiff did not lack the RFC to perform at least medium duty work with the above-noted non-exertional limitations.

At Step Four, the ALJ found that Plaintiff is able to perform his past relevant work. The vocational expert testified at the hearing that a hypothetical person with an RFC identical to Plaintiff's would be able to perform Plaintiff's past relevant work as a kiln placer and washer/cleaner. Since these jobs do not require extensive interaction with others and are routine and repetitive in their nature, the ALJ concluded that Plaintiff is capable of performing these past jobs.

At Step Five, the ALJ found that there are other jobs in significant numbers in the national economy that Plaintiff is able to perform based on the factors such as his age, education, work experience, and RFC. The vocational expert had testified that a person with Plaintiff's RFC would be able to perform the requirements of representative occupations such as hand packager, laundry worker II, housekeeper, and hand presser. The expert stated that these jobs provide 44,500 jobs in the state economy. Therefore, based on the expert's testimony, the ALJ concluded that Plaintiff is not disabled because he is able to perform a significant number of other jobs in the national economy in addition to his past relevant work.

## DISCUSSION

Plaintiff claims that the ALJ erred in three ways in coming to the conclusion that Plaintiff is not disabled: (1) the ALJ erred in not giving controlling weight to the opinion of the treating physician regarding the nature and severity of Plaintiff's impairment, (2) she failed in her duty to fully and fairly develop the record with regard to Plaintiff's functional capacity, and (3) she improperly discredited Plaintiff's subjective complaints.

## I.   The ALJ did not err in determining that Dr. Wright's opinion regarding the nature and severity of Plaintiff's impairment should not be given controlling weight.

Plaintiff claims that Dr. Wright's opinion was not given controlling weight despite the fact that it was well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. Dr. Wright opined that Plaintiff has "no useful" function in many areas with "extreme" difficulties of social functioning, and had four or more episodes of decompensation with extended duration. The Court finds that the ALJ did not err in not giving controlling weight to Dr. Wright's opinion. His opinion is not supported by objective medical evidence and is inconsistent with other evidence.

If a treating source's opinion on the issue of the nature and severity of an individual's impairment is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, an adjudicator is required to give it controlling weight. 20 C.F.R. § 404.1527(d)(2). *See Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). This process of judging whether or not to give controlling weight to the treating source's

opinion "requires an understanding of the clinical signs and laboratory findings and what they signify."[5] SSR 96-2p.

When an adjudicator decides not to give controlling weight to a physician's opinion, then she may apply the following factors in determining the weight to give the opinion of the treating source: length of the treatment relationship and frequency of examination, nature and extent of the treatment relationship, supportability, consistency, specialization, and any other relevant factors. 20 C.F.R. § 1527(d)(2)(i)-(ii), § 1527(d)(3), and § 1527(d)(6). An adjudicator may reasonably reject a treating physician's opinion that is unsupported by the objective medical evidence. *See Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). A treating physician's opinion "may be discounted if it is internally inconsistent or inconsistent with other evidence." *Knight v. Charter*, 55 F.3d 309, 314 (7th Cir. 1995).

### A.   Dr. Wright's opinion is not supported by objective medical evidence.

Dr. Wright's opinion is not supported by objective medical evidence because his medical opinion as to Plaintiff's mental impairment was not grounded in any

---

[5]    Clinical signs are defined as "anatomical, physiological, or psychological abnormalities which can be observed," apart from one's own statements. Psychiatric signs are "medically demonstrable phenomena that indicate specific psychological abnormalities," for example, abnormalities of behavior, mood, thought, memory, orientation, development, or perception. These signs must also be shown by observable facts that can be medically verified. 20 C.F.R. § 404.1528(b).

Laboratory findings are defined as "anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques." These findings include chemical tests, electrophysiological studies, roentgenological studies, and psychological tests. 20 C.F.R. § 404.1528(c).

medically acceptable diagnostic techniques and was solely based on Plaintiff's subjective statements.

A treating physician's medical findings must be demonstrated by medical evidence consisting of signs, symptoms, and laboratory findings. 20 C.F.R. §§ 404.1508, 416.908. The regulation further guides the ALJ to consider "all relevant and available clinical signs and laboratory findings." 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1). "Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities" such as "abnormalities of behavior, mood, thought, memory, orientation, development, or perception." 20 C.F.R. §§ 404.1528(b), 416.928(b).

No medical records corroborate Dr. Wright's opinion that Plaintiff has "no useful" function in many areas with "extreme" difficulties of social functioning. No medical records demonstrate that Plaintiff had four or more episodes of decompensation with extended duration. Thus, Plaintiff failed to demonstrate that Dr. Wright's opinion is supported by medically acceptable diagnostic techniques. *See Brihn v. Astrue*, 332 Fed. Appx. 329, 332 (7th Cir. 2009) (holding that since the only records supporting the treating physician's opinion that the claimant suffered from depression or cognitive impairment were the physician's own statement and the claimant's own testimony, the treating physician's evaluation of the claimant's cognitive abilities was not grounded in any medically acceptable diagnostic techniques).

Instead of relying on objective medical evidence, Dr. Wright solely relied on Plaintiff's subjective statements, which are inconsistent with the record as discussed in Section III. Plaintiff's claim that there is no evidence other than his own statements on which Dr. Wright may reasonably rely in order to diagnose Plaintiff's medical impairment precisely identifies the problem both the ALJ and the Court have with Dr. Wright's opinions.

Even though Dr. Wright's observation about Plaintiff's affect, mood, behavior, and thought may constitute psychiatric signs under 20 C.F.R. § 404.1528(b), these signs still do not support his findings. Dr. Wright had been finding consistently that Plaintiff had an euthymic (or full) affect, intact thought, fine concentration, and no suicidal or homicidal plans even though he suffered from depression and anxiety. (Tr. 301, 1076, 1074, 1072, 1086, 1081). These physical signs do not demonstrate that Plaintiff has "no useful" function to work with "extreme" difficulties of social functioning nor do they demonstrate that Plaintiff had four or more episodes of decompensation.

Plaintiff's allegation that doctors usually do not have actual knowledge of how their patients would perform on the job has no merit because Dr. Wright failed to present any medical evidence that could support his opinions as to Plaintiff's inability to work. Thus, Dr. Wright had no basis for his statement that Plaintiff would miss more than four days of work per month.

Plaintiff argues that no records indicate that Dr. Wright was sympathetic to Plaintiff obtaining medical benefits and financial support. However, many

physicians "often bend over backwards to assist a patient in obtaining benefits." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). Here, it is evident from the record that Dr. Wright did support Plaintiff in obtaining financial support by writing a letter for Plaintiff. In that letter, Dr. Wright affirmatively stated that he "whole-heartedly support[ed]" Plaintiff's obtaining financial support. (Tr. 1096). Thus, the ALJ did not err in finding that Dr. Wright appeared to be sympathetic to Plaintiff in obtaining medical benefits.

**B.   Dr. Wright's opinions are inconsistent with his own treatment notes.**

Similarly, even Dr. Wright's own treatment do not support his findings because they are inconsistent between themselves, which impairs their credibility. First, Dr. Wright repeatedly stated that Plaintiff had no side effects of the medication, which is inconsistent with his Mental Impairment Questionnaire on November 16, 2007. On the questionnaire, Dr. Wright noted that Plaintiff had some side effects of the medication such as drowsiness, fatigue, dizziness, decreased stamina, and slowed cognition that "may have implications for working." (Tr. 1042). The ALJ correctly indicated this inconsistency in her decision. (Tr. 27). As noted above, an internally inconsistent opinion may be disregarded.

Second, Dr. Wright opined that Plaintiff had an "unstable" affect (Tr. 1042) even though he stated that Plaintiff had an euthymic affect in his other treatment notes. (Tr. 1065, 1068, 1070, 1072, 1074-76, 1081, 1083, 1086). Dr. Wright opined that Plaintiff's concentration was limited by racing thoughts and distractibility (Tr.

1042), but on that same day, Dr. Wright stated that Plaintiff's concentration was fine. (Tr. 1086-87).

Third, two mental ability assessments prepared by Dr. Wright on January 12, 2007 (Tr. 1038-1040) and November 16, 2007 (Tr. 1042-1047) respectively are inconsistent with each other.[6] Dr. Wright called "moderately limited" Plaintiff's ability to understand and remember detailed instructions in January 12 assessment (Tr. 1039), while he checked "no useful ability to function" for Plaintiff's ability to understand and remember detailed instructions in the November 16 assessment. (Tr. 1045). He called "not significantly limited" Plaintiff's ability to maintain socially appropriate behavior and "moderately limited" Plaintiff's ability to interact appropriately with the general public in January 12 assessment, while he checked "no useful ability to function" for the two same categories on November 16 assessment. (Tr. 1046). He also called "markedly limited" Plaintiff's ability to travel in unfamiliar places in January 12 assessment, while he checked "limited but satisfactory" for the same category in November 16 assessment.

Finally, it is also inconsistent to state that Plaintiff has no useful ability to set "realistic goals or make plans independently" and "understand and remember

---

[6]     Moreover, each of Dr. Wright's assessments is internally inconsistent. On January 12, 2007, he checked "markedly limited" for Plaintiff's ability to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, which was inconsistent with other findings that Plaintiff was "moderately limited" in interacting appropriately with the general public and "not significantly limited" in maintaining socially appropriate behavior. (Tr. 1039-1040). Also, on November 16, 2007, he assessed as "no useful ability" for Plaintiff's ability to understand and remember detailed instructions, which again contradicted his assessment that Plaintiff had a "limited but satisfactory" ability to carry out detailed instructions. (Tr. 1045).

detailed instructions," while calling Plaintiff's thought process "intact" (Tr. 1065, 1089), "normal" (Tr. 1076), or "logical and goal directed." (Tr. 1070). Since Dr. Wright's opinions as to Plaintiff's mental impairment lack consistency and supportability, the ALJ's decision not to give controlling weight to them is reasonable and also consistent with the principles set forth in 20 C.F.R. § 1527 (d)(3)-(4).

### C.    **Dr. Wright's opinion is inconsistent with other substantial evidence.**

Dr. Wright's opinion that Plaintiff has extreme difficulty in socializing and has no useful ability to work is inconsistent with other physicians' treatment notes, and with Plaintiff's daily activities and his other work activities. Other physicians who have treated Plaintiff did not report this kind of social difficulty or a resulting inability to work. Plaintiff argues that these other doctors saw him before the alleged onset date of June 2006, and thus have no bearing on the credibility issue of Dr. Wright's opinion. However, Plaintiff's anxiety and social difficulties had been treated by numerous doctors for approximately three years prior, none of whom noted an "extreme" problem.

Even though other physicians' treatment notes pre-date the alleged onset date, they tend to discredit Dr. Wright's opinion that Plaintiff has an extreme social difficulty and no useful function to work: (1) the psychiatric assessment prepared on August 4, 2003 showed that Plaintiff had only generalized anxiety disorder with depressive symptoms and obsessive compulsive disorder, (2) the mental RFC assessment prepared on November 13, 2003 showed that Plaintiff only had

25

"moderately" difficulty in socializing with co-workers and was "not significantly limited" ability to understand, remember, carry out detailed instructions, and (3) the several other physicians who had treated Plaintiff from 2003 to 2006 only noted Plaintiff's general anxiety problem but did not indicate any kinds of "extreme" social difficulty or inability to work.

Moreover, Dr. Wright himself noted that Plaintiff had these same symptoms such as irritability, restlessness, and anger outbursts, "long before" Plaintiff was on medication on July 17, 2006. (Tr. 301). Thus, based on Dr. Wright's opinion, there is no reason to discredit other physicians' reports as to Plaintiff's mental impairment because those physicians observed Plaintiff in the same conditionf as Dr. Wright did.

Plaintiff is relying on an instance[7] that occurred before the onset date to prove his aggressive character. It would be inconsistent to require the ALJ to disregard other physicians' reports only because they were made before the onset date when Plaintiff is allowed to use a piece of evidence from before the onset date.[8] Therefore, the Court finds that the ALJ did not err in finding that Dr. Wright's opinion is inconsistent with other physicians' opinions.

Second, Dr. Wright's opinion is inconsistent with Plaintiff's daily activities. Dr. Wright's opinion that Plaintiff has extreme difficulties in socializing is not

---

[7]     Plaintiff complained about the medical staff and stated his desire to stab members of the staff in September 2005. (Tr. 581).

[8]     Moreover, the fact that Plaintiff made complaints or expressed his anger toward the medical staff itself does not indicate Plaintiff's "extreme" social difficulty. It is not unusual for an individual to complain to the medical staff when the individual thinks that he or she was not treated in an appropriate way.

consistent with the fact that Plaintiff was able to maintain relationships with those he chose to have relationships with, such as his girlfriend and his brother. He has maintained a relationship with his girlfriend for more than eight years. Also, no record indicates that Plaintiff engaged in any kind of violent conduct while he was hospitalized for his abdominal pain.

Dr. Wright's opinion that Plaintiff has no useful ability to work is also inconsistent with Plaintiff's daily activities. Plaintiff was able to take care of himself in his daily life and to attend regular appointments with his physicians. He was able to drive, prepare meals, and travel. Therefore, the relevant evidence in the record does not support Dr. Wright's finding that Plaintiff has a severe mental impairment resulting in his inability to work. *See Bunch v. Heckler*, 778 F.2d 396, 400-401 (7th Cir. 1985) (concluding that the claimant had no severe mental impairment because her daily activities were consistent with basic work activities and her allegations were not credible).

Finally, Dr. Wright's opinion is inconsistent with Plaintiff's past work activities as well. Plaintiff was able to work as a kiln placer, washer/cleaner, and machine operator despite his illness. His past work activities demonstrate that he is able to concentrate to complete tasks and get along with co-workers and supervisors. The reason given by Plaintiff for quitting his job in 2003 was because he could not "handle the pain" resulting from his costochondritis condition which was exacerbated by the physical demands of his job, not because of his mental

limitations. This evidence all weighs against Dr. Wright's opinion that Plaintiff is not capable of working.

Plaintiff argues that there is other evidence tending to show his aggressive character toward other people: Plaintiff punched a wall on one occasion when he got mad with off-color remarks made by his girlfriend's relatives, threw a table once, and showed his anger toward hospital staff. However, even with this evidence, the Court finds that the ALJ did not err in her credibility determination because of these few episodes and the ALJ relied on other substantial evidence of Plaintiff's non-aggressive behavior under somewhat similar circumstances.

An ALJ's credibility determinations will be affirmed on appeal unless the appellant can demonstrate that they are "patently wrong." *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir. 1989). A reviewing court will uphold an ALJ's decision "if it is reached under the correct legal standard and if it is supported by substantial evidence." *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). Since the ALJ's decision not to give controlling weight to Dr. Wright's opinion is supported by substantial evidence such as Plaintiff's daily activities, his past work activities, and other physicians' treatment notes, it should be affirmed.

Plaintiff argues that his actual daily activities include very little activity, and are limited to driving, preparing meals, watching television, and sleeping, and do not provide an adequate basis for judging his level of impairment. However, there can hardly be better examples on which the ALJ may rely in finding restrictions of daily living activities of an individual than the activities undertaken by Plaintiff.

Next, Plaintiff argues that there was no reason to discredit Dr. Wright's opinion based on the fact that Dr. Wright failed to mention Plaintiff's drug and alcohol abuse history. However, the ALJ discredited Dr. Wright's opinion because she found that Plaintiff has the ability to control himself, as shown by his following prescribed treatment including abstaining from alcohol and drugs over an eight year period. The Court finds that the ALJ's rationale was reasonable. The fact that Plaintiff is able to abstain from alcohol and drugs is inconsistent with Dr. Wright's opinion that Plaintiff has no useful ability to function in many areas.

## II.   The ALJ did not have a duty to further develop the record with regard to Plaintiff's mental RFC.

Plaintiff argues that the ALJ had a duty to further develop the record as to his mental RFC. Plaintiff alleges that the ALJ failed to consult a state agency physician or to order a new mental RFC assessment when the only assessment prepared by other physicians was prepared almost two and a half years before the alleged onset date. Since Plaintiff argues that the only evidence submitted regarding his mental RFC is the opinion of Dr. Wright, he complains that the ALJ failed in her duty to fully and fairly develop the record.

When the evidence received from an individual's treating source is inadequate for an adjudicator to determine whether the individual is disabled, the adjudicator has a duty to further develop the record. 20 C.F.R. § 404.1512(e). "An ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable." *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004). Simply finding that the evidence fails to support the treating

source's opinion, though, does not trigger the ALJ's duty to further develop the record. *See Simila v. Astrue*, 573 F.3d 503, 516-17 (7th Cir. 2009). Here, the Court finds that the ALJ did not breach her duty to further develop the record because the evidence that the ALJ received was not "inadequate" in determining whether Plaintiff is disabled.

The ALJ found Dr. Wright's opinion regarding Plaintiff's RFC was unreliable because of its lack of consistency and supportability. Due to these problems, the ALJ gave more weight to Plaintiff's past relevant work history and his daily activities in finding that Plaintiff is not disabled. This is not a situation where the ALJ needed to re-contact Dr. Wright or to consult a state agency physician in order to collect more evidence due to inadequacy or incompleteness of the evidence. Here, the ALJ decided to give less weight to the evidence that she reasonably found was inconsistent with and unsupported by other substantial evidence, while she had other substantial evidence on which to rely. The ALJ simply found that the evidence did not support the entirety of Dr. Wright's opinion, which does not trigger a duty to further develop the record. *See Simila*, 573 F.3d at 516-17. It is Plaintiff who has the burden to prove disability and to demonstrate an impairment that is of sufficient severity to preclude him from pursuing his past work. *McNeil*, 614 F.2d at 145. Since Plaintiff has failed to meet that burden, the ALJ has no duty to further develop the record.

Moreover, unlike Plaintiff's allegation that the ALJ asserted her own opinion without finding any other medical evidence, the ALJ did have other substantial

evidence as well as Dr. Wright's opinion. The ALJ based her decision on Plaintiff's past relevant work history, his daily activities, and other physicians' notes which do not indicate any socially disruptive behaviors by Plaintiff. Plaintiff was able to work as a kiln placer, washer/cleaner, and machine operator despite his mental limitations. He was able to attend to his own personal needs, meet doctors regularly, and get along with others well. Plaintiff showed no symptoms of extreme social difficulty when he was seen by other physicians from 2003 to 2006.

Also, the ALJ took into account Dr. Wright's assessment regarding Plaintiff's limited capacity to perform given instructions in concluding that Plaintiff can only perform routine and repetitive work tasks. The ALJ did not conclude that Plaintiff has no limitation at all, but only found that Plaintiff does not have an *extreme* social difficulty. She also explicitly instructed the vocational expert at the hearing to consider a new limitation that the job requires no more than occasional interaction with co-workers and supervisors, taking into account Plaintiff's difficulty with social interaction.

Plaintiff's allegation that the only mental RFC prepared by another physician is outdated is irrelevant because the record does not indicate that the ALJ relied on this data in rendering her decision. Therefore, based on the record of the case, the Court finds that the ALJ properly determined that Plaintiff is not disabled without further developing the record.

**III.   The ALJ properly discredited Plaintiff's subjective complaints as to his mental impairment.**

Plaintiff alleges that his testimony that he becomes enraged at others is supported by the record. Plaintiff presents instances in which he had difficulty socializing to argue that his statements are credible and supported by other evidence. This evidence includes the instances of punching a wall, throwing a table, expressing a desire to stab hospital staff, and complaining about hospital staff. Lastly, Plaintiff counters the ALJ's statement that Plaintiff has not engaged in any socially deviant behavior by presenting his battery conviction record.

An individual's own statement as to his or her physical or mental impairment alone is not enough to establish that there is a physical or mental impairment. 20 C.F.R. § 404.1528(a); SSR 96-7p. No matter how genuinely the individual appears to complain, no symptom can be the basis for a finding of disability without supporting medical signs and laboratory findings. SSR 96-7p. In assessing the credibility of an individual's statements about pain or other symptoms, an adjudicator may base her decision on the following factors: the medical signs and laboratory findings; diagnosis, prognosis, and other medical opinions provided by treating or examining doctors; and statements and reports from the individual and from treating or examining doctors, treatment and response, prior work record and efforts of work, daily activities, and other information related to the symptoms. SSR 96-7p. When a claimant has worked despite an impairment, and other medical evidence does not support the finding that the alleged impairment significantly affected the claimant's ability to work, an adjudicator may reasonably find that the alleged impairment

does not prevent the claimant from working. *See Pugh v. Bowen*, 870 F.2d 1271, 1278 (7th Cir. 1989).

The Court finds that the ALJ did properly discredit Plaintiff's subjective statements regarding his symptoms and mental impairment because his statements are inconsistent with the record as a whole. First, his initial SSI application on August 18, 2003 directly conflicts with a statement made at the hearing on July 22, 2008. In his initial SSI application, Plaintiff stated that he quit the job at Modern Machine and Manufacturing because of chest pain. (Tr. 93). However, at the hearing, he testified that he quit the same job because of his mental stress and missing work. (Tr. 1117). These two conflicting statements undermine his credibility.

Second, the fact that Plaintiff was able to interact with his brother, hospital staff, and his girlfriend contradicts his claims. Plaintiff was able to get along with his girlfriend for more than eight years. He also did not show any socially disruptive behavior while he was hospitalized in a hospital due to his abdominal pain.

Third, other physicians' reports as to Plaintiff's mental ailment are contrary to Plaintiff's allegations. Other physicians who have treated Plaintiff did not note any kind of socially disruptive behaviors by Plaintiff. Their reports only indicated that Plaintiff had generalized anxiety with depressive symptoms and obsessive compulsive disorder, and that there could be a possible link between Plaintiff's chest pain and his mental problem. None of them noted any kind of Plaintiff's "extreme" social difficulty.

Fourth, the fact that Plaintiff was able to work at his past jobs with his mental limitations weighs against his subjective statement that he is unable to work. Plaintiff worked as a kiln placer, washer/cleaner, and machine operator despite his alleged mental impairments. Even though this work was prior to the alleged onset date, the record (including Dr. Wright) indicates that Plaintiff had the same mental problems at the time when he was working. Since Plaintiff had worked despite his impairment, and other evidence does not support his statements, the ALJ reasonably found that the alleged impairments do not prevent Plaintiff from working. *See Pugh*, 870 F.2d at 1278.

Finally, Plaintiff's actual daily activities also weigh against his subjective statements. The ALJ may rely on the daily activities of an individual in reaching a conclusion as to whether the individual is disabled or not. *See Jens v. Barnhart*, 347 F.3d 209, 212-13 (7th Cir. 2003) (holding that the record as a whole, including the plaintiff's daily activities, support the ALJ's decision that the plaintiff has the RFC to perform his past relevant work); *see also* 20 C.F.R. § 416.929(c)(3)(i). Plaintiff is able to take care of himself. He is able to attend appointments with numerous doctors and to follow prescribed treatment including abstaining from alcohol and drugs. The ALJ correctly pointed out that Plaintiff's actual daily activities do not demonstrate his complete disability. Thus, the ALJ correctly found that Plaintiff's actual ability to function is evidenced by his ability to get along with others, his ability to work in the past, his ability to engage in daily activities and care for

himself, and his ability to control his symptoms, including his ability to abstain from alcohol and drugs.

Even though Plaintiff presented some evidence showing that he had occasionally engaged in violent behaviors, the ALJ was reasonable to discredit his subjective statements based on the whole record because Plaintiff's statements were not consistent with the other evidence. Consistency is a strong indication of the credibility of an individual's statements. SSR 96-7p. An adjudicator may judge the credibility of the individual's statements based on their consistency both internally and with other information in the case record. SSR 96-7p. Here, Plaintiff's own statements conflict with one another and are inconsistent with other evidence as indicated above. Therefore, the ALJ did properly discredit Plaintiff's subjective statements regarding his mental limitations.

Plaintiff added that his battery conviction proves that he has extreme rage or aggressive behavior toward others. It is not clear from the record whether the ALJ did consider the fact that Plaintiff was convicted of a battery in August 2008 in articulating her decision. However, even if the ALJ should have, but did not, considered Plaintiff's battery conviction when she decided Plaintiff's credibility, it would not change the outcome of this case because it constitutes a harmless error.

The Seventh Circuit has held that the doctrine of harmless error is applicable to Social Security appeals. *See e.g.*, *Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003). "Harmless errors are those that do not affect the ALJ's determination that a

claimant is not entitled to benefits." *Kolesar v. Shalala*, No. 93-c-3834, 1994 WL 30544, *11 (N.D. Ill. Feb. 3, 1994).

The underlying rationale for the ALJ in discrediting Plaintiff's subjective statements was their lack of consistency and supportability. The ALJ specifically stated that Plaintiff's statements are not supported by other medical evidence, Plaintiff's actual daily activities, and Plaintiff's past work history. The ALJ had other evidence showing Plaintiff's aggressive behavior when she made her decision. The ALJ discredited Plaintiff's statements even with the knowledge of those instances because she gave more weight to the objective evidence such as Plaintiff's daily activities and past work history. Therefore, the Court concludes that the ALJ would have made the same decision even if she had considered the fact that Plaintiff was convicted of a battery.

In sum, the Court finds that the ALJ properly weighed Plaintiff's subjective complaints, and took his difficulty with both concentration and social interaction into account when determining Plaintiff's non-exertional limitations on his RFC. She properly concluded that Plaintiff could work in spite of these problems.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Doc. 10) is DENIED and Defendant's Motion for Summary Affirmance (Doc. 12) is GRANTED.

CASE TERMINATED.

Entered this <u>29th</u> day of July, 2010.

s/ Joe B. McDade

JOE BILLY McDADE
United States Senior District Judge